United States District Court
Southern District of New York
————————————————————————

U.S. BANK NATIONAL ASSOCIATION,        12 Civ. 423 (JGK)

              Plaintiff,        OPINION AND ORDER

     - against -

NESBITT BELLEVUE PROPERTY LLC, ET
AL.,

              Defendants.
————————————————————————

JOHN G. KOELTL, District Judge:

    This case involves the plaintiff's attempt to appoint a
receiver for the defendants' properties because of the
defendants' default on loans for which the properties are
collateral.  U.S. National Bank ("U.S. Bank," the "plaintiff,"
or the "Trustee") is the Trustee, pursuant to a March 2006
Pooling and Servicing Agreement (the "PSA") of various loans,
including loans made to the defendants.  The defendants are
limited liability companies which own and operate, under the
Embassy Suites franchise, hotels that are collateral for the
defendants' loans.  In an Opinion and Order dated May 7, 2012,
the Court denied the defendants' motion to dismiss for lack of
subject matter jurisdiction, determined that diversity
jurisdiction pursuant to 28 U.S.C. § 1332 existed in this case,
and ordered that an evidentiary hearing be held to determine
whether the collateral is in jeopardy such that a receiver is

justified.  U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC,
--- F. Supp. 2d ---, No. 12 Civ. 423, 2012 WL 1590518 (S.D.N.Y.
May 7, 2012).  At that evidentiary hearing, the defendants moved
for judgment as a matter of law on the basis that the
appointment of a receiver would be improper in this case because
no other relief is sought.  See generally Gordon v. Washington,
295 U.S. 30, 37 (1935) ("[T]here is no occasion for a court of
equity to appoint a receiver of property of which it is asked to
make no further disposition.").

The general background of this case is set forth in this
Court's previous Opinion and Order, U.S. Bank, 2012 WL 1590518,
at *1, and will be repeated only as necessary to resolve the
current disputes.  For the reasons explained below, the
defendants' motion is denied, and the plaintiff's motion to
appoint a receiver is granted.  The following constitutes the
Court's findings of fact and conclusions of law.


                              I.

Whether a federal court should appoint a receiver in a
diversity action is governed by federal law.  Varsames v.
Palazzolo, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000).  "The
appointment of a receiver is considered to be an extraordinary
remedy, and should be employed cautiously and granted only when
clearly necessary to protect plaintiff's interests in the

                              2

property."  <u>Rosen v. Siegel</u>, 106 F.3d 28, 34 (2d Cir. 1997)

(internal alterations and quotation marks omitted).  "The

following factors are relevant to establishing the need for a

receivership:

> 'Fraudulent conduct on the part of defendant; the
> imminent danger of the property being lost, concealed,
> injured, diminished in value, or squandered; the
> inadequacy of the available legal remedies; the
> probability that harm to plaintiff by denial of the
> appointment would be greater than the injury to the
> parties opposing appointment; and, in more general
> terms, plaintiff's probable success in the action and
> the possibility of irreparable injury to his interests
> in the property.'"

<u>Varsames</u>, 96 F. Supp. 2d at 365 (quoting Wright & Miller,

Federal Practice & Procedure § 2983 (1999)) (internal

alterations omitted).

As an initial matter, the parties dispute who bears the

burden in this case.  The plaintiff, citing <u>D.B. Zwirn Special</u>

<u>Opportunities Fund, L.P. v. Tama Broadcasting, Inc.</u>, 550 F.

Supp. 2d 481, 491 (S.D.N.Y. 2008), argues that, where the loan

agreement indicates that the parties have consented to the

appointment of a receiver, "the party opposing the appointment

bears the burden of demonstrating why a receiver should not be

appointed."  <u>Id.</u> at 491.  However, in <u>D.B. Zwirn</u>, the agreement

at issue provided that in the event of a default "[t]he Agent

may . . . seek the appointment of a receiver" and that "the

Transaction Parties further agree to consent to the appointment

of a receiver (selected by the Agent and approved by the
Required Lenders) by any court of competent jurisdiction." Id.
at 484 (alterations omitted).  In this case, the security
agreements on the properties provide only that, in the event of
a default, U.S. Bank "may . . . apply for the appointment of a .
. . receiver  . . . of the Trust property." See Ginsberg Decl.
Ex. 5 (the "Bellevue Hotel Deed of Trust"), at 7-8.  Here, as in
Citibank, N.A. v. Nyland (CF8) Ltd., 839 F.2d 93 (2d Cir. 1988),
the agreement provides that the bank "may apply for the
appointment of a receiver," but there is no explicit consent by
the defendants to the appointment.  Id. at 97.  Here, as in
Nyland, "the appointment of a receiver is not automatic under
the mortgage agreement" and still requires an "adequate showing"
by the plaintiff.  Id.  Thus, the burden remains on the
plaintiff.  However, the existence of a provision authorizing
the application for a receiver in the event of a default,
"strongly supports the appointment of a receiver" when there is
a default.  Id.

     There are no allegations of fraud in this case, but courts
have "appointed receivers even where there was no evidence of
fraud." D. B. Zwirn, 550 F. Supp. 2d at 491 & n.64 (citing
United States v. Trusty Capital, Inc., No. 06 Civ. 8170, 2007 WL
44015, at *8 (S.D.N.Y. Jan. 5, 2007)).  There is, moreover, no
dispute that the defendants have defaulted on the loans at

4

issue.  The principal amount of the loans was $187,500,000, and the maturity date was February 6, 2011, at which time all of the loans became due and payable.  (Ginsberg Decl. ¶¶ 3-5.)  On February 6, 2011, the defendants defaulted on their obligations by failing to pay the amounts then due and owing, and there remains in excess of $175,000,000 due and owing to the plaintiff.  (Ginsberg Decl. ¶¶ 15-17.)  Thus, the plaintiff can foreclose on the properties, and is likely to succeed in ultimately obtaining possession of the properties.  (See, e.g., Bellevue Hotel Deed of Trust, at 7-8 (indicating remedies for default).)

However, the parties dispute the existence of any imminent danger of the diminution of the value of the properties.  This is a critical factor in the analysis of whether to appoint a receiver.  See, e.g., Melnick v. Press, No. 06 Civ. 6686, 2007 WL 2769490, at *1 (E.D.N.Y. Sept. 21, 2007) ("Plaintiffs are required to make a clear showing that the appointment is necessary to prevent irreparable injury.").  Relatedly, the parties dispute the balance of harms between the risk of such a diminution in value if a receiver is not appointed, and the injury that the defendants would suffer if one is appointed.  On May 9, 2012, the Court held an evidentiary hearing to address these disputed issues.  Based on the testimony and documents

introduced at that hearing, the Court determines that the motion for a receiver should be **granted**.

### A.

The eight collateral hotel properties (hereinafter, the "Hotels" or the "Collateral") are all managed by Windsor Capital Group, Inc. ("Windsor"),[1] and are licensed under the Embassy Suites Franchise.  They are located in six different states.

There is no dispute that, if the Hotels were to lose their licenses to operate under the Embassy Suites brand, that would substantially diminish their value.  In April, 2012, Windsor received letters from the licensor with regard to each of the Hotels, explaining that each of the Hotels was in default of the

---

[1] Windsor has moved to intervene in this case on the basis that the Court should consider its interests in its consideration of "the injury to the parties opposing appointment." Varsames, 96 F. Supp. 2d at 365; (see May 9, 2012 Evid. Hr'g Tr. at 2-3 ("A: The only reason that we're seeking to have Windsor join is in the analysis that the Court was supposed to do about whether to appoint a receiver, the cases speak, among other things, about the prejudice to the party opposing appointment of the receiver. . . . [I]t occurred to me that someone might argue or try to argue that they're not technically opposing the appointment of the receiver because they're not a party to this action and have not intervened. And that is the only reason that we're seeking to intervene.").)  The Court will consider the potential harm to Windsor in its analysis to the extent that those issues were raised in the parties' papers and at the evidentiary hearing. The motion to intervene is therefore **denied without prejudice as moot**.

license agreement "as a result of its failure to comply with
required Embassy Suites brand and product quality standards."
(May 9, 2012 Evid. Hr'g, Exs. C-1, C-2, C-3, C-4, C-5, C-6, C-7,
& C-8.)  The letters explain that the Hotels must cure the
default by July 19, 2012, and that if they do not do so, then
the franchise licenses may be terminated on September 1, 2012.
(Id.)  The defaults relate to the Hotels' failure to obtain a
satisfactory score on Quality Assurance Evaluations ("QAs") that
took place between December, 2011 and March, 2012.  (Id.)

    At the evidentiary hearing, Patrick Nesbitt, the founder,
CEO and Chairman of Windsor, explained that the QAs are given
approximately every six months.  (May 9, 2012 Evid. Hr'g Tr. at
55.)  A hotel is awarded 4,000 points, which are spread evenly
between 4 major categories, and between 10 and 50 weighted
subcategories.  (Id.)  These categories include so-called "brand
standards," which are the latest brand-wide requirements.  (Id.)
An inspector then grades each subcategory and deducts points
within each category.  The total points are then added up.
(Id.)  A score of 2400 or less is considered a failing score
which will put the hotel in default.  (Id. at 59.)

    After receiving the default notices, Nesbitt assembled a
team of senior managers at Windsor to determine the most cost
effective way to recover points on the QAs.  (Id. at 58.)
Nesbitt testified at the hearing that, if the defendants are

7

able to raise their scores in the next round of QAs, the default notices will be "eliminated." (Id. at 59-60.)  The plan that Nesbitt and Windsor created comprises two stages of improvements that would cost a total of over $4.4 million. (Id. at 60-65; see also May 9, 2012 Evid. Hr'g, Exs. B & D.)  Nesbitt could not testify that the $4.4 million dollars would keep the Hotels in compliance with the franchise license for the duration of license agreement, but only that it would "get us past the next QA." (May 9, 2012 Evid. Hr'g Tr. at 75, 78.)  The total cost of bringing the Hotels into compliance with all brand standards would be much higher. (Id. at 108-109.)

### B.

Neither the defendants nor Windsor has the $4.4 million to pay for the improvements necessary to avoid the imminent loss of the Embassy Suites franchise. (May 9, 2012 Evid. Hr'g Tr. at 75, 106.)  It is also undisputed that the loans at issue have been in default for over a year. (See, e.g., id. at 76 ("Q: When did this loan mature? . . . . A: February 6, 2011.  Q: Have you satisfied your obligations at that point?  A: In terms of what?  Q:  Paying off your debt pursuant to the loan documents?   A: We do not have the ability to pay off the entire debt, no.").)

At the evidentiary hearing, Robert Ginsberg, the asset manager who manages the defendants' loans for the plaintiff, explained that, because the loans are in default, all of the funds generated by the Hotels are trapped in a cash management account, over which Torchlight, the Special Servicer for the loan, has control.  (Id. at 11.)  The defendants, under Ginsberg's supervision, then draw against the cash management account for their operating expenses, and Torchlight applies funds to the principal and interest payments due on the loan when there are sufficient funds in the cash management account that debt service would not "jeopardize the hotel's operations." (Id. at 11-12; see also id. at 14 ("A:  So we've been allowing the debt service to fall further and further behind.  If we do allow the debt service to fall behind, the trust makes an advance to the bondholders, which then starts to accrue interest.  We don't like to have it get behind, but we do because we don't want the properties to be injured.").) Ginsberg explained that approximately $1.2 million in combined principal and interest payments are due on the loans each month, and that the defendants are currently six months behind in their payments on the loans.  (Id. at 12; see also May 9, 2012 Evid. Hr'g, Ex. Px.1.)  In addition, Ginsberg testified that the defendants are sixteen months in arrears on approximately $227,000 monthly payments for property maintenance reserves, and

one month in arrears on an approximately $228,000 payment to a tax and insurance escrow account.  (May 9, 2012 Evid. Hr'g Tr. at 15-16; see also May 9, 2012 Evid. Hr'g, Ex. Px.1.)  The property maintenance reserve account currently contains $300,000.  (May 9, 2012 Evid. Hr'g Tr. at 17.)  There are over $11 million in total payments in arrears.  (May 9, 2012 Evid. Hr'g, Ex. Px.1.)

The defendants have requested that Torchlight release funds from the management account to pay the $4.4 million cost of the two initial phases of improvements so that the Hotels will not lose the Embassy Suites franchise.  (See May 9, 2012 Evid. Hr'g, Ex. D.)  However, with respect to the requested $4.4 million, Ginsberg testified that "there isn't any particular account that has that cash, unless you also count the cash which was available for operations."  (May 9, 2012 Evid. Hr'g Tr. at 19; see also id. at 31-37.)[2]

---

[2] Windsor's CFO, Neil Cohen, testified that the $2.9 million figure cited by Ginsberg as the total amount in the cash management account as of the day before the evidentiary hearing was not correct, and should be higher, explaining that "[y]es, that's what's in their account.  But you haven't added in May revenue."  (May 9, 2012 Evid. Hr'g Tr. at 95.)  However, this argument is not credible.  Ginsberg testified that the $2.9 million included all revenue received thus far that had not been released for operating expenses or otherwise put in the capital or tax reserve accounts or applied to debt service.  While it is undisputed that the $2.9 million will undoubtedly grow over the course of the month of May, those funds will then be drawn upon

Under the loan documents, the plaintiff is authorized to advance funds to the defendants for capital improvements to the Hotels, with the funds advanced becoming part of the loan owed by the defendants. (Id. at 38-39.) The plaintiffs have granted such requests for advances for certain urgent capital improvement projects. (Id. at 77 (advance was made for a "roof issue that needed immediate correction").) However, Ginsberg testified that Torchlight is "reluctant" to recommend that U.S. Bank advance the requested $4.4 million or make brand improvements without a receiver and that "we would prefer to do that . . . when we don't have Windsor Management managing the property at a point in time when we have to make those very substantial advances." (Id. at 36-38.) The plaintiff is not obligated to advance additional money to the defendants.

### C.

At bottom, the plaintiff faces a stark choice in the absence of a receiver. It can loan at least another $4.4 million, and possibly much more, to a debtor that has been in default for well over a year, adding the new loan to the one which is already in default and for which payments are in

---

to pay June expenses. (Id. at 32-33 (Ginsberg).) Moreover, the defendants' argument for the availability of the funds for improvements ignores the $11 million that is in arrears.

arrears.  Or, if it does not do so, the Hotels that are its sole
recourse as collateral for the loan will lose much of their
value due to the loss of the Embassy Suites franchise license.
The Hotels are in default of their franchise licenses, and
unless improvements to the Hotels are made—improvements that
there is no dispute that the defendants and Windsor cannot pay
for—imminent and irreparable harm to the value of the Hotels is
highly likely.

The defendants argue that it will be a greater harm to the
properties if a receiver is appointed, because the receiver
likely will hire a new management company to manage the Hotels,
thus depriving the hotels of Windsor's experience with these
specific properties.  (May 9, 2012 Evid. Hr'g Tr. at 66-69.)
However, the plaintiff has proposed that the receiver be
authorized to employ Crescent Hotels & Resorts LLC,
("Crescent"), a new property manager.  Crescent has extensive
experience managing properties that are distressed and has the
resources to effect a seamless management transition.  (George
Decl. ¶ 8.)  This would be a far more effective protection for
the properties than a continuation of the current management.
If the current management and ownership remain, there will be no
money to make the improvements that are necessary to cure the
Hotel's pending default with respect to their franchises.  While
the defendants argue that the plaintiff should simply "be

12

reasonable" and loan the defendants additional funds, (id. at 78), the plaintiff is not obligated to do so, and has every reason to seek to avoid loaning additional money to the defendants given the current status of the loan.[3]  In the absence of such a loan, the substantial diminution of the Hotels' value is inexorable.

The defendants argue, rightly, that the appointment of a receiver, and the likely displacement of Windsor as the manager of the Hotels, will have a deleterious effect on Windsor.  (Id. at 69.)  However, any harm to Windsor is tempered by the fact that, under Windsor's management, all of the Hotels have been issued default notices by the franchisor and all the Hotels are substantially in arrears of their obligations to the plaintiff.

---

[3] See, e.g., D.B. Zwirn, 550 F. Supp. 2d at 492 ("Tama's mounting obligations, in addition to the money owed to plaintiff, and its failure to demonstrate any concrete plan for recovering its debts strongly militates in favor of appointment. Notwithstanding the assertion made by Tama's affiant that the Court should require the parties 'to develop a plan to market the properties for a deliberate arms-length sale' rather than appoint a receiver, that level of cooperation and communication between the parties appears highly unlikely at this time." (internal quotation marks omitted)); Trusty Capital, 2007 WL 44015, at *8 ("Defendant has defaulted, and continues to be in default, on a large obligation to Plaintiff.  Although there is no evidence of fraud on the part of Defendant's current management, Defendant has also failed to demonstrate any concrete plan for recovering its debts, other than seeking to borrow more funds.  This is an insufficient guarantee, and would leave SBA with insufficient means to recover what it is owed.").

The dispositive issue is whether the appointment of a receiver is "clearly necessary to protect plaintiff's interests in the property." <u>Nyland</u>, 839 F.2d at 97 ("It is entirely appropriate for a mortgage holder to seek the appointment of a receiver where the mortgage authorizes such appointment, and the mortgagee has repeatedly defaulted on conditions of the mortgage which constitute one or more events of default."); <u>see also</u> <u>Sovereign Bank v. 347 East 173 LLC</u>, No. 11 Civ. 1061, 2011 WL 2693525, at *3 (S.D.N.Y. June 29, 2011).  The near certainty of inexorable and substantial diminution in the Hotels' value has been established in this case, and the motion for a receiver should be granted.

However, before the motion may be granted, the Court must consider the defendants' motion for judgment as a matter of law.

## II.

Relying on the Supreme Court's decision in <u>Gordon</u>, the defendants argue that the Court should not appoint a receiver in this case because the receivership is not ancillary to some other final relief, and a receivership cannot be an end in itself.

Rule 66 of the Federal Rules of Civil Procedure contemplates the appointment of receivers by federal courts. <u>See</u> Fed. R. Civ. P. 66.  The adoption of Rule 66 in 1938 did not

14

revise existing receivership practice; rather the Federal Rules "provided that federal receiverships should continue to be governed as they had been before." Bicknell v. Lloyd-Smith, 109 F.2d 527, 529 (2d Cir. 1940) (L. Hand, J.); accord Wright, Miller, Kane & Marcus, Federal Practice and Procedure § 2983. The appointment of a receiver in a federal diversity action is governed by federal law. See U.S. Bank, 2012 WL 1590518, at *4 (citing Varsames, 96 F. Supp. at 365); accord New York Life Ins. Co. v. Watt West Inv. Corp., 755 F. Supp. 287, 290-92 (E.D. Cal. 1991). A receiver appointed in federal court in an action involving property in different districts has jurisdiction and control over all such property, upon giving a bond as required by the court. 28 U.S.C. § 754. Process can also be issued and executed in any district where the property is situated. 28 U.S.C. § 1692.

As a general matter, when a receiver is sought pursuant to Rule 66 in a diversity case, "the appointment of a receiver in equity is not a substantive right but is a remedy that is ancillary to the primary relief prayed for in the suit." Wright, Miller, Kane & Marcus, Federal Practice and Procedure § 2983; see also id. at § 2981 & n.9 (a receiver's "appointment is incident to other proceedings in which some form of primary relief is sought") (collecting cases); accord Touchett v. Am. Tel. & Tel. Co., 71 F. Supp. 671, 672 (E.D. Wisc. 1947) ("It is

15

fundamental that a receivership cannot be the primary object of litigation. It is not an end in itself." (citing Gordon, 295 U.S. at 37); see generally Kelleam v. Md. Cas. Co. of Baltimore, Md., 312 U.S. 377, 380-81 (1941).[4] Thus, while a Court with subject matter jurisdiction may have the authority to appoint a receiver, such an appointment may be an abuse of discretion where no other relief is sought.  See id. at 380 ("The error in the appointment was not a question of authority but of propriety."); see also Andrews v. Andrews & Andrews, Inc., 47 F. Supp. 871, 872 (E.D.N.Y. 1942) ("The request must be ancillary to some other relief which it is appropriate for equity to give. Here no relief is requested other than a receivership.").  The defendants argued that, based on Gordon, "a federal court of equity will not appoint a receiver where the appointment is not ancillary to some form of final relief . . . ."  295 U.S. at 38.  The defendants argue that no other relief is sought in this case and therefore that the request for a receiver should be denied.

---

[4] By contrast, where a plaintiff brings a state law cause of action for the appointment of a receiver in federal court, pursuant to a state statute that creates the substantive right to a receiver, the appointment of a receiver may be considered both a right and a remedy.  See Glenbrook Capital Ltd. P'ship v. Kuo, 525 F. Supp. 2d 1130, 1147-49 (N.D. Cal. 2007).  In this case, however, U.S. Bank seeks a receiver pursuant to Rule 66 of the Federal Rules of Civil Procedure.

There is disagreement among district courts with respect to what, aside from a receiver, must be sought by a plaintiff for receivership to be appropriate.  The classic example in which the appointment of a receiver is ancillary or incidental to some primary form of relief is where a plaintiff has brought a foreclosure action and requests a temporary receiver pending the foreclosure.  See, e.g., Nyland, 839 F.2d at 95-96 (action for a receiver commenced simultaneously with foreclosure action in state court that was thereafter removed to federal court); U.S. Bank Nat'l Ass'n v. Crutch, No. 09 Civ. 998, 2010 WL 2978172, at *1, *4 (E.D.N.Y. July 26, 2010) (plaintiff sought a receiver as an equitable remedy in a foreclosure action before the district court); see generally Gordon, 295 U.S. at 37 ("Where a final decree involving the disposition of property is appropriately asked, the court in its discretion may appoint a receiver to preserve and protect the property pending its final disposition. For that purpose, the court may appoint a receiver of mortgaged property to protect and conserve it pending foreclosure."). This is because receivership is "traditionally used to protect the value of an asset that is the subject of litigation." United States v. Ianniello, 824 F.2d 203, 205 (2d Cir. 1987).

In this case, no immediate relief other than the appointment of a receiver is sought directly from the Court. See Complaint, U.S. Bank v. Nesbitt, No. 12 Civ. 423, Docket No.

17

1 (S.D.N.Y. Jan. 18, 2012) ("Compl."), at ¶¶ 36-51 & A-L.
Torchlight asset manager Ginsberg confirmed this during the
recent evidentiary hearing.  (See May 9, 2012 Evid. Hr'g Tr. at
25 ("Q. To your knowledge is there any kind of relief that you
are seeking from Judge Koeltl other than the appointment of this
receiver on the terms described in your complaint?  A.  Not that
I can think of.").)  Ginsberg also testified that U.S. Bank had
not commenced any foreclosure action anywhere against the
properties at issue, but asserted that this was "the intent."
(Id. at 24 ("A. Eventually we hope to foreclose on the
properties.  That's one of the goals.  If the borrower comes up
with some proposal which sounds good, we could do a deal with
them.  We're trying to get the properties into a situation where
they are not in jeopardy and exercising our rights.").)

        In this case, the appointment of a receiver is necessary to
preserve the property for the secured lender and to effectuate
the foreclosure and liquidation of the properties that are
spread over six states.  The Complaint asks not simply that a
receiver be appointed to manage the properties and collect
revenue from them.  Compl. at ¶¶ B-F.  The Complaint also asks
that the "[p]laintiff be permitted to commence and consummate,
without further order of this Court, judicial and non-judicial
foreclosure proceedings" against any of the Hotels, and that the
proposed receiver "be authorized, upon request by Plaintiff, to

list or otherwise advertise for sale . . . and to sell the
Hotels . . . ." Compl. at ¶¶ I-J.  In short, the plaintiff
seeks to vindicate its right to the Collateral by liquidating
the Collateral, and the plaintiff is seeking a receiver with the
power to preserve the value of the Hotels, <u>and</u> to liquidate
them.  Moreover, the relief sought plainly contemplates
foreclosure proceedings in the various states where the hotels
are located.  <u>Cf.</u> 28 U.S.C. § 754 (providing for the ability of
federal receivers to take control of property in different
districts); 28 U.S.C. § 1692 (providing for the ability of
federal receivers appointed in one district to serve and execute
process in any district in which the property at issue is
located).  The foreclosure and ultimate liquidation of the
Hotels is the final relief which requires the appointment of a
receiver to preserve the Collateral while the receiver
alleviates the danger.  <u>See, e.g.</u>, <u>Gordon</u>, 295 U.S. at 39
("[T]he summary remedy by receivership, with the attendant
burdensome expense, should be resorted to only on a plain
showing of some threatened loss or injury to the property, which
the receivership would avoid."); <u>Rosen</u>, 106 F.3d at 34.[5]

---

[5] The plaintiff relies on <u>Federal National Mortgage Association
v. Wellington Investments, LLC</u>, No. 11 Civ. 11414, 2011 WL
2787270, at *3 (E.D. Mich. July 15, 2011), in which the Court
declined to appoint a receiver even though Fannie Mae was
pursuing foreclosure by advertisement under Michigan law.  That

19

While receiverships should be "be watched with jealous eyes lest their function be perverted," Kelleam, 312 U.S at 381, and while the rule that a party may not simply bring a naked action for a receiver in the absence of some path to further, final relief (namely foreclosure and liquidation of the Collateral) serves that vigilance, it would not serve the purpose of equity to dismiss this case and force the plaintiff to file a foreclosure action in six different states before the appointment of a receiver.  See Inland Empire Insurance Company v. Freed, 239 F.2d 289, 293 (10th Cir. 1956) ("Authoritative decisions have undoubtedly laid a heavy hand on the exercise of federal equity jurisdiction to appoint receivers in diversity cases where the relief sought is readily available in the state courts or by state processes.  But we do not interpret the admonishments of restraint as an absolute bar to the exercise of equity jurisdiction where the exigencies require it, or where

---

decision is distinguishable because the court explicitly found that Fannie Mae was not seeking a final disposition of the property, id., while part of the relief sought in this case is the sale of the collateral.  It should also be noted that the Wellington decision differs from two other decisions of the same court.  See Fed. Nat'l Mortg. Ass'n v. Mapletree Investors Ltd. P'ship, No. 10 Civ. 10381, 2010 WL 1753112, at *3 (E.D. Mich. Apr. 30, 2010); Fed. Nat'l Mortg. Ass'n v. Maple Creek Gardens, LLC, No. 09 Civ. 14703, 2010 WL 374033, at *2 (E.D. Mich. Jan. 25, 2010).

its exercise is clearly in the public interest and will not conflict with state processes.").

The Court's equitable power to appoint a receiver extends to situations where a plaintiff who is a secured creditor seeks the appointment of a receiver to avoid a substantial and preventable decline in the value of its collateral, where the only other proposed alternative is a large loan to a debtor who is already in default, and where an explicitly stated and contemplated end of the receivership is the sale of the properties.  Because that is the case here, the defendants' motion for judgment as a matter of law is **denied**.  Moreover, because it is a proper use of the Court's equitable power to grant the motion for a receiver in this case, and because there is a strong likelihood of imminent and irreparable harm to the value of the Hotels in the absence of the appointment of a receiver, the motion for a receiver will be **granted**.


### CONCLUSION

The Court has carefully considered all of the parties' arguments. To the extent not specifically addressed above, they are either moot or without merit.  For the reasons stated above, the defendants' motion for judgment as a matter of law is **denied**, and Windsor's motion to intervene is **denied without**

prejudice as moot.  U.S. Bank's motion for the appointment of a receiver is granted.

The plaintiff will provide a proposed order appointing a receiver by May 30, 2012.

The defendants should submit any objections by June 1, 2012.

The plaintiff should submit any reply to the defendants' objections by June 2, 2012.

The Clerk is directed to close Docket Nos. 56 and 59.

SO ORDERED.

Dated:     New York, New York
           May 29, 2012

                                    John G. Koeltl
                            United States District Judge

22